Filed 5/22/23

# <u>CERTIFIED FOR PARTIAL PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DEANTHONY TYQUAN GOVAN,<br><br>    Defendant and Appellant. | B316245<br><br>(Los Angeles County<br>Super. Ct. No. VA149784) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Andrew C. Kim, Judge.  Affirmed in part; reversed in part; and remanded with directions.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

---

*       Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts A.1 through A.7 of the Factual and Procedural Background and parts C through F of the Discussion.

Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

_____

DeAnthony Tyquan Govan appeals from a judgment of conviction after the jury found him guilty with respect to four victims of three counts of false imprisonment by violence; three counts of forcible oral copulation; three counts of forcible rape; and one count of attempted forcible rape.  The trial in this case took place during the COVID-19 pandemic.  In the published portion of the opinion, we address Govan's contention the trial court abused its discretion and deprived him of due process by ordering him to wear a restraint belt during jury selection, which was held in an unsecured jury assembly room instead of a courtroom because of the pandemic.  We agree the trial court abused its discretion in requiring Govan to wear a restraint belt without making an individualized finding at the time of jury selection that Govan posed a safety or flight risk or that he was likely to disrupt the proceedings; however, the error was harmless.  We also address Govan's contention the court violated his constitutional and statutory rights by receiving the jury verdicts in his absence.  Govan was quarantined as a result of exposure to the COVID-19 virus while in the county jail, which would have resulted in a two-week delay in receiving the verdicts.  Because Govan's absence during the reading of the verdicts did not interfere with his ability to defend against the charges, there was no constitutional or statutory violation.

We also address in the published portion of the opinion Govan's contention his sentence must be vacated and remanded for the trial court to exercise its discretion under recent

2

amendments to Penal Code section 654[1] made by Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 441) (Assembly Bill 518), effective January 1, 2022.  Govan contends, the People concede, and we agree Assembly Bill 518's changes to section 654 are ameliorative changes that apply retroactively to nonfinal judgments under *In re Estrada* (1965) 63 Cal.2d 740, 744.

However, the People argue section 654, notwithstanding changes to the law, does not apply to sentences imposed under the one strike law (§ 667.61).  The People point to language in section 667.61, subdivision (h), which bars a trial court from placing a one-strike offender on probation or suspending execution or imposition of a one-strike sentence.  The People argue a stay imposed under section 654 should be treated the same as a probationary sentence, relying on *People v. Caparaz* (2022) 80 Cal.App.5th 669, 689-690 (*Caparaz*), in which Division Two of the First Appellate District concluded on this basis that section 654 does not apply to one-strike sentences.

We disagree with our colleagues in *Caparaz*.  Reasonably read, section 667.61, subdivision (h), prohibits only probation and not a stay under section 654.  The language in subdivision (h) is unique to a grant of probation.  Moreover, section 667.61, subdivision (h), is intended to increase the punishment for forcible sex offenses, whereas section 654 is intended to ensure the punishment for an offense is commensurate with a defendant's culpability where two crimes arise from a single, indivisible course of conduct.  Because the one strike law does not

---

[1] Further undesignated statutory references are to the Penal Code.

preclude a stay under section 654, Govan is entitled to resentencing under amended section 654.[2]

Govan also contends, the People concede, and we agree the trial court erred in awarding Govan 1,008 days of presentence custody credit instead of 1,020 days. However, Govan is not entitled to any conduct credit because the one strike law bars an award of conduct credit to a one-strike offender.

In the unpublished portion of the opinion we consider Govan's contentions the trial court abused its discretion in admitting evidence that victim Kenyetta F. was forced into prostitution; the court erred in finding victim Soraya G. was an unavailable witness and allowing her preliminary hearing testimony to be read to the jury; and the court committed prejudicial error in instructing the jury with CALCRIM No. 315 on the certainty factor for witness identification in light of *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*). There was no prejudicial error.

We affirm Govan's convictions, vacate the sentence, and remand for resentencing.

---

[2] As we discuss in the unpublished portion of the opinion, we also agree with Govan's contention that Senate Bill No. 567 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 731, § 1.3) (Senate Bill 567) applies retroactively to the case, requiring a remand for the trial court to comply with the amendments to section 1170, subdivision (b). Under the amendments, the trial court must impose a sentence that does not exceed the middle term unless the defendant stipulates to the facts supporting the circumstances in aggravation, a jury or a judge in a court trial finds the aggravating facts true beyond a reasonable doubt, or a prior conviction supports imposition of the upper term.

4

# FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Evidence at Trial*

Three victims testified at trial: Markita L., Breauhna B., and Kenyetta.  In addition, the preliminary hearing testimony of a fourth victim, Soraya, was read to the jury because the trial court found she was an unavailable witness.

Markita, Kenyetta, and Soraya testified that they were sex workers.  According to the women's testimony, Govan arranged for them to meet him at his apartment complex on different days.  Govan brought the women to the complex's laundry room, where he forced them to orally copulate him, and then he raped or attempted to rape them while holding an Airsoft gun.[3]  Breauhna testified she met Govan through a dating website and invited him to her home for a lunch date.  While at her home, Govan forcibly raped her.

Govan admitted in his testimony that he met Markita, Kenyetta, and Soraya and took them to the laundry room to have sex.  But he testified he had consensual sex with each of the women, he did not use a weapon, and he fled after each sexual encounter to avoid paying for the services.  Govan claimed he never met Breauhna.

After Govan's arrest, he made a jail call to his girlfriend, codefendant Krishanna Wheeler.  The prosecution played the jail

---

[3]    "An 'airsoft' gun is a toy weapon that uses air to propel plastic pellets at a nonlethal velocity." (*Equinox Holdings, Inc. v. National Labor Relations Board* (D.C. Cir. 2018) 883 F.3d 935, 937, fn. 1.)  It is clear from the testimony and statements by the trial court at sentencing that the Airsoft gun used by Govan was not a "real gun" but resembled one.

call for the jury, in which Govan asked Wheeler to obtain contact information for Soraya and Kenyetta and told Wheeler the "'game plan'" was "'to make sure they don't come to court.'"

      1.     *Markita—September 2017 incident*

In September 2017 Markita was engaged in sex work and worked on her own without a pimp. She posted an advertisement on Craigslist with a phone number customers could use to contact her. Govan contacted Markita using the phone number in her advertisement. Through text messages and calls, Markita agreed to meet Govan at an apartment complex in Lakewood for a "15-minute quick session." Govan told Markita his family was at home, so they would have to use the laundry room.

On the morning of September 3, 2017 Markita arrived at the apartment complex and met Govan in front of the building. They greeted each other, and Govan guided her to the nearby laundry room. Govan opened the door of the laundry room with a key, and Markita followed him into the room. Govan told Markita he would be right back, and she turned her back to him to look for a condom in her wallet.

Within 10 seconds Govan returned, and in an aggressive tone he directed Markita to "'turn the fuck around.'" Markita turned around and saw Govan pointing a gun at her face. The gun was black with a long ammunition clip extended from it. Markita asked Govan, "'Why are you doing this?'" Govan responded by asking the same question. Markita replied, "'This is just, like, what I do, you know, what do you want? I have a child. I want to go back home to my child." Govan then opened Markita's wallet and saw it was empty.

Govan ordered Markita to get on her knees and suck his penis. When Markita told Govan she did not want to do it and tried to stall, he started counting while still pointing the gun "very close" to her head. Markita reluctantly engaged in oral copulation, and Govan lost patience with how she was performing the act. He told Markita to turn around and pull down her pants. Markita complied, but she told Govan to get a condom from her wallet. When Govan put his gun down to put on the condom, Markita slid her cell phone off the washer. Markita and Govan struggled over the cell phone before Govan grabbed his gun from the floor. Markita then screamed and charged at Govan. She fought him and "eventually he got scared and he just ran out the door." During the fight, the gun clip fell out. Markita suffered a bloody lip, scratches on the base of her neck, and scrapes on her knuckles and knees.

After Govan left the laundry room, Markita ran upstairs. She banged on an apartment door, and Leah McClain and her husband opened the door and let Markita come inside. McClain observed Markita was crying and holding a black metal clip in her hands. Markita disclosed she met a man in the laundry room, he "pulled a gun on her to rob her," and he "made her give him oral sex at gunpoint." Markita said the clip had come from the attacker's gun and she had grabbed it from the floor when she ran out of the laundry room. McClain and her husband called the police and assisted Markita with her injuries.

2. *Breauhna—June 2018 incident*

In June 2018 Breauhna met Govan on a dating website called Plenty of Fish. After Breauhna and Govan exchanged text messages three or four times, they met by video chat and then in

7

person.  When Govan arrived at Breauhna's apartment in Long
Beach, she let him inside, and he gave her a hug.  They then sat
on the couch and talked.  Because Govan had agreed to bring
lunch, Breauhna inquired where the food was.  Govan responded
by asking if she still wanted the food.  Breauhna replied, "'No, it's
okay.'"  Govan then became "really aggressive" and put his hands
roughly on her.  Breauhna asked, "'What's wrong [with] you?
Why [are] you, you know, so aggressive?'"  When Breauhna stood
up from the couch to go to the balcony, Govan came from behind
and placed her in a choke hold.  Breauhna said, "'What are you
doing?  I can't breathe.'"  Govan responded, "'What do you mean?
This is just who I am.'"  Breauhna told Govan to leave and
"budged away from him."  Govan pulled her backward toward the
kitchen area.  Govan said he wanted to have sex, and Breauhna
replied, "'No, I want you to just leave.'"

Govan next pushed Breauhna into her bedroom and told
her to lie on her back.  She exclaimed, "'I don't want to.  I don't
want to do this.  I don't know you.'"  Govan pushed Breauhna on
the bed, pulled on a condom, and put his penis in her vagina.
When Govan finished, he got up and said "bye" before walking
out of her home.  Breauhna did not initially contact the police
because she "was in denial" of what happened and only knew
Govan's cell phone number.  She did not know his name or any
other information about him.  A few weeks after the incident,
Breauhna sent a text message to Govan stating "he was a
scammer, an abuser, and a rapist."  Breauhna later reached out
to the police after she saw a crime bulletin about Govan.

Detective Tifani Stonich of the Los Angeles County Sheriff's
Department Special Victims Bureau, in the course of her
investigation into the sex crimes believed to be committed by

8

Govan, obtained the messages sent by Breauhna to Govan and the telephone number of the cell phone Govan used to communicate with Breauhna. Detective Stonich contacted Breauhna, who explained she had generated a different telephone number from her cell phone to text Govan because "she was scared of him." She sent a message to Govan after the incident because "she wanted him to know what he had done, and hopefully that would scare him to not do it to somebody else." Breauhna identified Govan in court as the perpetrator.

### 3. *Soraya—November 2018 incident*

On November 30, 2018 Govan contacted Soraya through a website called Backpage, which is a website that is used to "meet people . . . to get money." He sent her a photograph, but of someone else. Govan asked Soraya to meet him at an apartment complex in Lakewood to provide sexual services in exchange for money. At approximately 10:00 p.m. Soraya arrived at the apartment complex and met Govan by the front gate. Soraya confirmed Govan was the person she had communicated with earlier. Govan led Soraya to the laundry room, and he opened the door with a keycard. Once they were inside the laundry room, Soraya was talking on her cell phone with her head down when she felt a gun pointed at the back of her head. She turned around, and Govan said, "'Don't look at me.'"

Govan then told Soraya to take off her clothes and get on the floor. Soraya kneeled on the floor, and her cell phone fell out of her pocket. Govan directed her to turn off her phone, which she did. Govan told Soraya to "suck his dick" as he pressed a black gun to the back of her head, and she complied. Govan then penetrated Soraya vaginally from behind while continuing to

press the gun to the back of her head. During the vaginal intercourse, Soraya repeatedly pleaded with Govan not to kill her because she had a baby, and he told her to "'shut up.'" Govan recorded the vaginal intercourse on his cell phone. After Govan finished, he told Soraya to count to 10, and he left. Soraya went to the hospital, where she contacted the police. When Soraya told Govan by text that she was going to the police, he responded, "'I don't care.'"

4.    *Kenyetta—December 2018 incident*

In December 2018 Kenyetta worked as a sex worker. Most of Kenyetta's appointments with customers were arranged by her pimp who communicated with her by cell phone. At some point the pimp arranged for Kenyetta to meet with a customer (Govan) in Lakewood. Kenyetta communicated with Govan by text messages, and he asked her to meet him at an apartment building during the daytime on December 31, 2018.

Kenyetta met Govan at the apartment building and confirmed he was the person who had contacted her for services. She followed Govan to a laundry room, and he opened the door. Govan then pulled out a black gun from his waistband and pointed it at Kenyetta's face. Govan ordered, "'Get on your knees, bitch." Kenyetta pleaded, "'[P]lease,'" and Govan replied, "'Shut the fuck up.'" Govan then unzipped his pants while continuing to hold the gun and stated, "'Suck my dick, bitch.'" Kenyetta orally copulated Govan and observed he was wearing "a gray-and-black Gucci belt." At this point, Kenyetta was on her knees, and Govan directed her to turn around. She complied, and he inserted his penis into her vagina. He said, "'If you do as I say, I won't shoot you.'" Less than 10 minutes later, Govan jumped up, and

10

Kenyetta stood up and looked at him. Govan demanded, "'Bitch, don't look at me." He then ran out of the laundry room with his gun.

Kenyetta called 911. In the call, which was played to the jury, Kenyetta stated she was at an apartment complex in Lakewood to meet her sister when a man approached her, asked for directions to the laundry room, and "pulled a gun out on [her]." Kenyetta added that the man told her, "'Now, bitch, you need to suck my dick,'" and Kenyetta responded, "'I'm not gonna suck anything.'" Kenyetta called the police, and about 20 minutes later two or three deputy sheriffs arrived. One deputy directed Kenyetta to call Govan using her cell phone. Govan answered and told Kenyetta that law enforcement would not do anything because Kenyetta "was out there working the streets." He added that he lived in Los Angeles, not Lakewood.

5.    *The investigation*

Detective Stonich testified she determined in her investigation that Govan lived in an apartment within the Lakewood apartment complex that contained the laundry room in which the incidents with Markita, Kenyetta, and Soraya occurred. Detective Stonich conducted a search of Govan's residence and recovered a black Airsoft gun and a multi-colored Gucci belt.

The prosecutor also played a jail call Govan made to Wheeler, in which he provided Wheeler with the full names for Soraya and Kenyetta (and a third woman, Jasmine T.),[4] and

---

[4]    During the trial, the court granted the prosecutor's motion to dismiss (§ 1383) counts 4, 5, 6, and 19 for false imprisonment,

11

Govan and Wheeler discussed a contact at the Department of Motor Vehicles who could help obtain contact information about the three women. Govan told Wheeler the "game plan" was to "[m]ake sure [the three women] are out of sight, out of mind." He added, "It's just to make sure they don't come to court."

### 6. *Govan's testimony*

Govan testified he met Markita through a website called Backpage, "where you locate prostitutes" and exchange sex for money. He texted Markita, and they agreed he would pay her approximately $150 for 30 minutes of sex. Govan gave Markita an address in Lakewood, and she met him there. Govan told her that his wife was at home, and he asked if they could "do the date in the laundry room." Govan suggested the laundry room because in the past, when he had sex with prostitutes without paying them in his home, they came back with their pimps and vandalized his residence.

Govan saw Markita place her black clutch on top of the washer, but he denied touching it. Govan and Markita had sex for 25 to 27 minutes in the laundry room. Govan then asked Markita to save his contact information as a regular customer, and he attempted to run out of the laundry room. Markita grabbed the back of Govan's shirt and screamed, "'Daddy. Daddy, he's trying to run off with the money. Daddy. Daddy.'" Govan had an empty ammunition magazine in his pocket, which fell out during his struggle with Markita. Govan then ran from the laundry room to his apartment, which was approximately

_____

forcible oral copulation, and forcible rape of Jasmine, as well as dissuading Jasmine from prosecuting a crime.

12

100 feet away.  From his apartment window, Govan saw Markita run up to a young man who was on the phone.  Govan heard the man say, "'Bitch, where my money?'"  Markita responded, "'Daddy, he ran that way.'"  The man then slapped her.  The man called Govan on his cell phone and said, "'You playing with pimpin' money.  You ran off with my money.  Come out pig.'"  Govan responded, "'Look, man.  Your girl got scammed.  I ran off with the money.  She seen the money.  She didn't take it.  I ran home.'"  Approximately 10 to 15 minutes later, Govan received a text message that read, "'Where your bitch ass at?  Where my money?  Where my money?  Pull up.  Come out.'"  Govan texted a fake address, and Markita sent him a photograph of the location and demanded that he meet her and pay the money.  Govan did not reply.

Govan also met Kenyetta through Backpage, and he agreed to pay her for sex.  Govan and Kenyetta went to the same laundry room, and he showed her a stack of cash before they engaged in sex acts.  After they finished, Govan suggested Kenyetta keep his phone number as a regular customer.  When Kenyetta reached for her cell phone to save his number, he ran out of the laundry room.  Kenyetta chased Govan, who ran up the stairs and down the street before losing her.  Once Govan reached his home, Kenyetta called and said, "'Oh, bring your punk ass outside.  My husband is here.  We've got big bullets.'"

Govan similarly met Soraya on Backpage.  They agreed to meet at an address that was directly behind Govan's apartment building.  Later that night Govan met Soraya and opened the gate for her.  He told her that his family was upstairs, and he asked whether she minded using the laundry room.  She responded, "'That's no problem.'"  Once Govan and Soraya arrived

at the laundry room, he showed her some cash. They negotiated a price for her services and engaged in oral sex and unprotected vaginal intercourse. After they finished, Govan asked Soraya to save his phone number as a regular customer. When Soraya reached for her cell phone, Govan ran out of the laundry room. Govan ran home and then received a text from Soraya that said, "'Oh, I'm a 15-year-old girl. I'm going to call the police. Why would you do that to me?'" Govan replied, "'Well, go ahead and do what you have to do. Call the police, because I didn't rape you.'" Soraya repeated in her text messages that she was 15 years old, Govan had raped her, and she would call the police. Govan then received a text message from another phone number with a photograph of a girl, reading, "'Hey, I'm outside.'" Govan believed Soraya had someone else send him the text message.

Govan denied ever knowing or seeing Breauhna. He acknowledged he met someone through the Plenty of Fish dating site, but it was not Breauhna. On cross-examination, he admitted he had received a text message that read, "You're a rapist, abuser, and a scammer. I'm reporting you." He believed the message was from Wheeler. Govan reiterated as to Breauhna that he had "never seen the lady a day in my life."

On cross-examination, Govan denied he ever raped or forced any of the four women to orally copulate him. But Govan admitted he solicited at least 20 prostitutes to come to the Lakewood location, and he scammed some of them out of money after the sexual encounters. Govan also acknowledged Detective Stonich found an Airsoft gun in his home and that he had "a whole bunch of Air Soft equipment."

14

7. *Detective Stonich's testimony*

On rebuttal, Detective Stonich testified that she and her partner had previously interviewed Govan as part of their investigation. Govan told Detective Stonich that Markita sustained injuries when they fought over the money Govan had brought to the laundry room because Govan said he was not going to pay her. Govan did not tell Detective Stonich that he saw Markita with a pimp. Nor did Govan say that he saw the pimp hit Markita.

B. *The Verdicts and Sentencing*

On October 25, 2021 the jury found Govan guilty of false imprisonment by violence of Soraya, Kenyetta, and Markita (counts 1, 7 & 10; § 236); forcible oral copulation of Soraya, Kenyetta, and Markita (counts 2, 8 & 12; § 288a, subd. (c)(2)(A)); forcible rape of Soraya, Kenyetta, and Breauhna (counts 3, 9 & 16; § 261, subd. (a)(2)); and attempted forcible rape of Markita (count 13; §§ 261, subd. (a)(2), 664). The jury also found true as to counts 2, 3, 8, 9, 12, 13, and 16 the special allegation under section 667.61, subdivisions (b) and (e)(4), that Govan committed the offenses against more than one victim.[5]

---

[5] At the end of the prosecution's case, the trial court granted Govan's motion for judgment of acquittal (§ 1118.1) on counts 17, 18, and 20 for dissuading witnesses Soraya, Kenyetta, and Markita from prosecuting a crime (§ 136.1, subd. (b)(2)) and count 21 for conspiracy to dissuade a witness (§ 136.1, subd. (c)(2)). The court likewise granted the motion of codefendant Wheeler under section 1118.1 to dismiss counts 17 (dissuading Soraya from prosecuting a crime) and count 21 (conspiracy to dissuade a witness). The jury found Govan not guilty of assault by means of force likely to produce great bodily injury on Markita (count 15;

Govan waived his right to a jury trial on the prior conviction allegation in the amended information. The trial court found true that in 2012 Govan suffered a sustained juvenile petition for rape in concert (§ 264.1, subd. (a)), and the prior adjudication was a strike within the meaning of the three strikes law (§§ 667, subds. (b)-(i); 1170.12) and a violent felony under section 667.5, subdivision (c). However, the court granted Govan's *Romero*[6] motion to strike the prior felony conviction allegation, and it dismissed the allegation under section 1385.

At the November 8, 2021 sentencing, the trial court imposed under section 667.61, subdivisions (b) and (e)(4), six consecutive sentences of 15 years to life on the forcible oral copulation and rape counts (counts 2, 3, 8, 9, 12 & 16) for an aggregate indeterminate term of 90 years to life. The court imposed a consecutive term of four years (the upper term) on count 13 for attempted forcible rape. The court also imposed and stayed under section 654 the upper terms of three years on each false imprisonment count (counts 1, 7, 10). The court awarded Govan 1,008 days of presentence custody credit and 151 days of conduct credit (15 percent of 1,008 days) for a total of 1,159 days.

Govan timely appealed.

---

§ 245, subd. (a)(4)). The jury deadlocked on the charge of attempted second degree robbery of Markita (count 14; §§ 211, 664), and the trial court declared a mistrial on that count.

[6]      *People v. Romero* (1996) 13 Cal.4th 497, 504.

16

# DISCUSSION

A.  *The Trial Court Erred in Physically Restraining Govan During Jury Selection, but the Error Was Not Prejudicial*

1.  *Trial court proceedings*

The trial took place in October 2021.  Prior to jury selection, the trial court noted for the record that Govan was "physically restrained by way of a restraint belt that is around his waist and connected to the back of his chair."  The court explained, "[G]iven that we are trying this case in extraordinary times during a global pandemic, we are conducting jury selection in a room which is normally used for jury assembly purposes. . . .  This room is an unsecured room.  It has multiple exits.  It has a window.  Mr. Govan and Ms. Wheeler are facing extremely serious charges, and so for that reason this court has made a decision to have Mr. Govan, who is in custody, restrained to a chair.  I also want to make note that we are using foldable tables as counsel tables and as the judge's bench.  Mr. Govan and Ms. Wheeler are, you know, some 15, 20 feet away from the closest juror in this case, and we don't have access to a lockup like we typically would in a courtroom."  The court added, "I also want to note that Mr. Govan is seated at a table, along with Ms. Wheeler and counsel, that is covered by a shroud; the front part is covered by a shroud.  No juror will know Mr. Govan is restrained.  Mr. Govan's belt is covered by his white dress shirt.  There will be no mention of Mr. Govan being restrained, and there will be no request by counsel or another party to ask Mr. Govan to stand up or to have Ms. Wheeler stand up, and so for all those foregoing reasons the court does find a manifest need to have Mr. Govan restrained in that manner."

17

Govan's attorney argued in response to the court's comments, "Your honor, I'm going to object to my client being restrained in this fashion. There's social distancing that has been relaxed in the entire [Los Angeles] County for courtrooms. There has been a trial in this building where jury selection took place in the courtroom just like we did before COVID. The courts are open to the public now. I believe that the choosing of the jury in this room is to accommodate the court, and that the court has made it seem like it is necessary to restrain my client in such fashion; however, there has been no individualized showing of need to restrain my client in this way, and I'll submit."

At that point the court stated for the record, "Let me . . . add that the restraint here, that's been used here, is only while we are in this particular room, not for the duration of the trial. And secondly, I do want to incorporate all of the findings, and all of the executive orders, and all of the orders, general orders, issued not only by the chief justice of the California Supreme Court but by the presiding judge of Los Angeles County."

2. *Governing law and standard of review*

"'In general, the "court has broad power to maintain courtroom security and orderly proceedings" [citation], and its decisions on these matters are reviewed for abuse of discretion. [Citation.] However, the court's discretion to impose physical restraints is constrained by constitutional principles. Under California law, "a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." [Citation.] Similarly, the federal "Constitution

18

forbids the use of visible shackles . . . unless that use is 'justified by an essential state interest'—such as the interest in courtroom security—specific to the defendant on trial.""" (*People v. Poore* (2022) 13 Cal.5th 266, 285 (*Poore*); accord, *People v. Bracamontes* (2022) 12 Cal.5th 977, 991 (*Bracamontes*); *People v. Young* (2019) 7 Cal.5th 905, 934 (*Young*).)

"""In deciding whether restraints are justified, the trial court may 'take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.' [Citation.] These factors include evidence establishing that a defendant poses a safety risk, a flight risk, or is likely to disrupt the proceedings or otherwise engage in nonconforming behavior.""" (*Bracamontes, supra*, 12 Cal.5th at p. 991; accord, *Young, supra*, 7 Cal.5th at pp. 934-935.) "[W]hen the evidence establishes a manifest need for restraints, the court should impose the least obtrusive or restrictive restraint that would be effective under the circumstances." (*Poore, supra*, 13 Cal.5th at p. 285; accord, *People v. Simon* (2016) 1 Cal.5th 98, 115.)

"""[W]e will not overturn a trial court's decision to restrain a defendant absent 'a showing of a manifest abuse of discretion.'" [Citation.] To establish an abuse of discretion, defendants must demonstrate that the trial court's decision was so erroneous that it "falls outside the bounds of reason."" (*People v. Miracle* (2018) 6 Cal.5th 318, 346; accord, *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390.)

3.    *The trial court abused its discretion in restraining Govan, but the error was harmless*

Govan contends the use of a lap belt to restrain him during jury selection was an abuse of discretion and violated his federal constitutional right to due process.  The People argue the use of a lap belt was justified by the necessity of selecting the jury in the unsecured jury assembly room as a result of the COVID-19 pandemic given Govan's violent history culminating in the alleged violent rape of three victims and attempted rape of a fourth victim.  The People further assert any error was not prejudicial because there was no evidence the jury could see the restraints.  We agree with Govan that the trial court abused its discretion in restraining Govan during jury selection; however, the error was not prejudicial.

As discussed, the trial court held voir dire in the jury assembly room as a result of the COVID-19 pandemic to enable the jurors to sit distanced from each other and others during jury selection.  Although we do not question the need to conduct jury selection in a larger room than a typical courtroom, the court failed to justify restraining Govan "on an individualized basis," with evidence showing Govan's conduct in custody or in the courtroom demonstrated a present safety or flight risk or that he was likely to disrupt the proceedings.  (*Bracamontes, supra*, 12 Cal.5th at pp. 991, 993 [trial court abused its discretion in requiring defendant to wear leg chains during trial where defendant had attempted to evade capture before his arrest, but "there was no evidence that defendant harbored a present intent to escape from custody or otherwise disrupt court proceedings"].)

The court focused on the nature of the jury assembly room (with the defendants seated within 15 to 20 feet of the closest

20

juror) and the "extremely serious charges" against Govan. Although Govan faced multiple counts of forcible oral copulation, forcible rape, and false imprisonment, as well as one count of attempted forcible rape (unlike codefendant Wheeler, who was not restrained in the jury assembly room), the fact Govan was charged with serious offenses was insufficient to support a finding of manifest need to restrain him. (*Id.* at p. 991 ["'The mere facts that the defendant is an unsavory character and charged with a violent crime are not sufficient to support a finding of manifest need.'"]; *People v. Bryant, Smith and Wheeler, supra*, 60 Cal.4th at pp. 389-390 [same].)

Given the lack of evidence that Govan had acted violently in custody or in court, disrupted the court proceedings, or harbored an intent to escape, the trial court abused its discretion in ordering the use of a lap belt to restrain him. (*Bracamontes, supra*, 12 Cal.5th at p. 991 ["'The imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion.'"]; *People v. Ervine* (2009) 47 Cal.4th 745, 773 [same].)

Although it was an abuse of discretion to physically restrain Govan during jury selection, he was not prejudiced by the error.[7] There is no evidence the jury saw the lap belt

_____

[7] Govan argues the People have the burden of establishing the error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24 because the use of the restraint belt violated his federal constitutional right to due process. However, the United States and California Supreme courts have only applied the *Chapman* standard for harmless error "where a court improperly orders the use of visible physical restraints." (*Bracamontes, supra*, 12 Cal.5th at p. 994 ["where a

because, as the trial court found (and Govan does not dispute), the belt was hidden by Govan's shirt and the covering on the front of his table. "It is settled 'that courtroom shackling, even if error, [is] harmless if there is no evidence that the jury saw the restraints, or that the shackles impaired or prejudiced the defendant's right to testify or participate in his defense.'" (*Poore, supra*, 13 Cal.5th at pp. 288-289; accord, *Young, supra*, 7 Cal.5th at p. 935.)

Govan contends he was prejudiced because the restraint belt likely caused discomfort and impeded his ability to confer and consult with his attorney during jury selection. A physical restraint has "the potential to impair an accused's ability to communicate with counsel or participate in the defense," but the error is harmless where the record "does not reveal any such

court improperly orders the use of visible physical restraints, '[t]he State must prove "beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.""']; accord, *People v. Ervine, supra*, 47 Cal.4th at p. 774 [shackling error only prejudices defendant's right to a fair trial where the jury can see the shackles in the courtroom, in which case the harmless-beyond-a-reasonable-doubt standard applies]; see *Deck v. Missouri* (2005) 544 U.S. 622, 635 ["where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, . . . [t]he State must prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained'"].) Because there is no evidence the lap belt was visible to the jury, any error was not federal constitutional error, and we analyze prejudice under *People v. Watson* (1956) 46 Cal.2d 818, 837, considering whether it is "reasonably probable that a result more favorable to [the appealing party] would have been reached in the absence of the error."

22

impairment occurred." (*People v. Ervine, supra*, 47 Cal.4th at pp. 773-774; accord, *Poore, supra*, 13 Cal.5th at pp. 290-291 [use of security chair that defendant claimed caused him back pain and resulted in his voluntary absence during part of jury selection was not prejudicial where his claim of back pain was uncorroborated, there was no evidence the jury saw the restraints or "the restraints hampered the defendant's ability to participate in trial," and there was no showing that defendant's "absence was due to continuing pain from one day of sitting in a lowered chair"]; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 155 [use of leg brace was harmless error where it was not visible to prospective jurors and there was "no evidence in the record that the leg brace was so physically restrictive or uncomfortable that [defendant's] ability to assist his attorney in conducting voir dire of the prospective jurors was impaired"].) There is no evidence in the record of any impairment to Govan's ability to assist his counsel with jury selection, and the restraints were not used during the remainder of the trial. Therefore, the error was harmless.

B.    *The Trial Court Did Not Violate Govan's Statutory and Constitutional Rights by Receiving the Verdicts in His Absence*

1.    *Trial court proceedings*

On October 25, 2021, outside the presence of the jury, the trial court informed the attorneys that the jury had reached verdicts on all counts except for count 14. The court stated, "I anticipate the court will declare a mistrial as to count 14 but take the verdicts as to the remaining counts. The complication is that the defendant is not here, and the defendant needs to be here."

23

The court explained Govan was not in court because he was "quarantined due to COVID-19" after he came "in contact with someone who did test positive." Noting "how contagious COVID-19 is, [and] how deadly this virus is," the court added, "The Sheriff's Department under no circumstances will transport someone who is under quarantine, and so it doesn't appear there is . . . anything else that can be done to try to get the defendant in court." The court stated the earliest Govan could be in court was November 8, "and that timeframe surpasses what the court had advised the jury." The court found under section 1148 that "no amount of reasonable diligence is going to procure the presence of the defendant" and "it is in the interest of justice that the verdict be received in his absence."[8]

Govan's attorney objected on the grounds that Govan's absence was not his fault; Govan could be present in court on November 8; Govan "was very clear about not waiving his presence for any sort of hearing or essential part of the proceedings"; and "this is an essential part of the proceeding." The trial court responded, "I can understand counsel's position, but . . . if we do set this case out to November 8th . . . we're going to lose jurors either by . . . plans they have, someone getting—God forbid—sick. There are just so many factors that are involved between now and November 8th that I do believe it's in the interest of justice to take the verdict now."

---

[8] Section 1148 provides, "If charged with a felony the defendant must, before the verdict is received, appear in person, unless, after the exercise of reasonable diligence to procure the presence of the defendant, the court shall find that it will be in the interest of justice that the verdict be received in his absence."

24

The court called in the jurors, declared a mistrial on count 14, and received the jury's verdicts on the other counts in Govan's absence.

2. *Governing law and standard of review*

A criminal defendant has a right to be personally present at trial under the confrontation clause of the Sixth Amendment and the due process clause of the Fourteenth Amendment to the United States Constitution, section 15 of article I of the California Constitution, and sections 977 and 1043.[9] (*People v. Suarez* (2020) 10 Cal.5th 116, 145-146 (*Suarez*); *People v. Clark* (2011) 52 Cal.4th 865, 1003-1004.)

However, "'[u]nder the Sixth Amendment's confrontation clause, a criminal defendant does not have a right to be personally present at a particular proceeding unless his appearance is necessary to prevent "interference with [his] opportunity for effective cross-examination."'" (*People v. Lewis*

---

[9] Former section 977, subdivision (b)(1), in effect at the time of Govan's trial, provided that a defendant charged with a felony "shall be personally present at the arraignment, at the time of plea, during the preliminary hearing, during those portions of the trial when evidence is taken before the trier of fact, and at the time of the imposition of sentence. The accused shall be personally present at all other proceedings unless he or she shall, with leave of court, execute in open court, a written waiver of his or her right to be personally present, as provided by paragraph (2)." Section 1043, subdivision (a), likewise requires "the defendant in a felony case be personally present at the trial." As discussed, however, section 1148 provides an exception for receiving the verdicts in a defendant's absence in specified circumstances where it is in the interest of justice.

25

*and Oliver* (2006) 39 Cal.4th 970, 1039 (*Lewis and Oliver*); accord, *People v. Clark, supra*, 52 Cal.4th at p. 1004.)  "Similarly, under the Fourteenth Amendment's due process clause, a criminal defendant does not have a right to be personally present at a particular proceeding unless he finds himself at a "stage . . . that is critical to [the] outcome" and "his presence would contribute to the fairness of the procedure.""" (*Lewis and Oliver*, at p. 1039; accord, *Clark*, at p. 1004.)  "'Under section 15 of article I of the California Constitution, a criminal defendant does not have a right to be personally present "either in chambers or at bench discussions that occur outside of the jury's presence on questions of law or other matters as to which [his] presence does not bear a ""reasonably substantial relation to the fullness of his opportunity to defend against the charge."""" (*Lewis and Oliver*, at p. 1039; accord, *Suarez, supra*, 10 Cal.5th at p. 146.)

We review de novo "'a trial court's exclusion of a criminal defendant from pretrial and trial proceedings, either in whole or in part, "insofar as the trial court's decision entails a measurement of the facts against the law."'" (*People v. Virgil* (2011) 51 Cal.4th 1210, 1235; accord, *People v. Cole* (2004) 33 Cal.4th 1158, 1230.)  The ""[d]efendant has the burden of demonstrating that his absence prejudiced his case or denied him a fair trial."'" (*Suarez, supra*, 10 Cal.5th at p. 146; accord, *People v. Blacksher* (2011) 52 Cal.4th 769, 799.)  "[W]e evaluate federal constitutional error for harmlessness under the *Chapman* beyond a reasonable doubt standard, and state law error under the *Watson* reasonably probable standard." (*People v. Perez* (2018) 4 Cal.5th 421, 438; accord, *People v. Mendoza* (2016) 62 Cal.4th 856, 901.)

3. *The trial court did not violate Govan's statutory or constitutional rights*

Govan contends the trial court committed prejudicial error and violated his constitutional rights by receiving the verdicts in his absence. There was no error.

*Lewis and Oliver* is instructive. There, defendant Anthony Oliver was hospitalized after he was stabbed by another jail inmate and was absent from court when the jury announced it had reached a verdict. (*Lewis and Oliver, supra*, 39 Cal.4th at pp. 1039-1040.) The Supreme Court upheld the trial court's finding under section 1148 that it was in the interest of justice to have the verdict read in Oliver's absence. (*Lewis and Oliver*, at p. 1040.) The Supreme Court explained there was no state law violation because at the time the jury announced it had reached a verdict, Oliver was in the intensive care unit for treatment of his stab wounds for an unknown duration and "a delay in announcing the verdict might have disrupted the proceedings or resulted in the loss of jurors." (*Ibid*.) The court continued, "Assuming without deciding that there is a constitutional right to presence at the reading of the guilt verdict, none of the cases cited by Oliver addresses whether such right is subject to an interest-of-justice exception analogous to the one applied here under section 1148. [Citation.] Consistent with due process principles, we conclude that the trial court properly determined that any constitutional right to presence was not absolute, and that—in the interest of justice—the verdict could be read while Oliver was physically incapacitated and unable to attend court following a third party assault." (*Ibid*.)

Here, Govan was absent from court when the jury rendered its guilty verdicts on October 25, 2021 because he was

27

quarantined following contact with someone who had tested positive for COVID-19. The sheriff's department refused to transport Govan to court until November 8, which was 14 days later. As the trial court reasoned, having the jury return in 14 days to read the verdicts in Govan's presence would extend the trial past the timeframe "the court had advised the jury," and the jurors could have other commitments or become sick due to the "deadly virus" during the intervening time. Although the court had impaneled two alternate jurors who were available as of October 25, there was a risk more than two jurors would become unavailable 14 days later to render their verdicts on November 8, especially in the middle of a global pandemic. Thus, the trial court did not err in finding under section 1148 that despite reasonable diligence the court was unable to obtain Govan's presence for the reading of the verdicts, and it was therefore in the interest of justice to receive the verdicts in his absence.

Nor did the trial court violate Govan's constitutional rights or statutory rights under sections 977 and 1043 by receiving the verdicts in his absence. As the Supreme Court explained in *Suarez, supra*, 10 Cal.5th at page 146, ""Neither the state nor the federal Constitution, nor the statutory requirements of sections 977 and 1043, require the defendant's personal appearance at proceedings where his presence bears no reasonable, substantial relation to his opportunity to defend the charges against him."" (Accord, *People v. Blacksher, supra*, 52 Cal.4th at p. 799.) Govan's inability to appear for the reading of the verdicts did not interfere with his ability to defend against the charges. The jury had reached its verdicts (except for count 14), and all that remained was for the verdicts to be read in the courtroom. Govan argues he was prejudiced because had he been

28

present, there was the "potential for compelling each of the jurors to psychologically confront the decision he or she had made concerning Govan's guilt." However, Govan has failed to meet his burden to show that his absence prejudiced his case or resulted in an unfair trial other than the speculative possibility that one juror would have changed his or her vote from guilty to not guilty after seeing Govan in the courtroom. (See *Blacksher*, at pp. 799-800 [no constitutional violation where defendant was absent 17 times during trial, including during discussion of objections to exercise of peremptory challenges, replacement of a juror, and discussion of penalty phase instructions and withdrawal of request for allocution, but "[h]is absence did not deprive him of the full opportunity to defend against the charges"].)

C. *The Trial Court Did Not Abuse Its Discretion in Admitting Evidence Kenyetta Was Forced into Prostitution*

1. *Trial court proceedings*

During the direct examination of Kenyetta, the prosecutor asked Kenyetta why she was a prostitute. Govan's attorney objected on speculation and relevance grounds, but the trial court overruled the objection. Kenyetta answered, "I was forced. I was human trafficked." Govan's attorney again objected, "Calls for legal conclusion. Motion to strike. Speculation. Foundation." The court ruled, "As to 'human trafficking' it's sustained. That portion of the answer will be stricken."

In response to the prosecutor's questioning of Kenyetta about why she did not in her 911 call disclose all the details of what had happened, Kenyetta answered that she was a victim of a crime and had been "trafficked." Defense counsel again objected, and the trial court struck the answer as nonresponsive.

29

When the prosecutor asked Kenyetta whether she disclosed Govan's rape to the responding sheriff's deputies, Kenyetta reiterated she "was trafficked at that time." The court again struck her answer as nonresponsive. The prosecutor then inquired, "[I]s there a reason why you would not want to talk about being raped to the deputies on that day when they responded to the location, your reason?" Kenyetta answered, "I have a pimp. You are ordered not to do certain things. There's certain things you just don't do." The prosecutor then asked, "So did you believe something negative would happen if you told them?" Kenyetta responded, "Oh, no, I didn't believe it. I knew. I knew."

2.      *Governing law and standard of review*
"'"No evidence is admissible except relevant evidence.' (Evid. Code, § 350.) 'Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."'" (*People v. Hardy* (2018) 5 Cal.5th 56, 87; accord, *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 822.) "'The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352.)" (*Hardy*, at p. 87; accord, *People v. Bell* (2019) 7 Cal.5th 70, 105.) Evidence "*may* have a lower probative value if it is merely cumulative of other evidence [citations] and there is a substantial danger of confusing or misleading the jury or a substantial danger of necessitating an undue consumption of time." (*People v. Holford* (2012)

203 Cal.App.4th 155, 178, fn. 14; see *People v. Pride* (1992) 3 Cal.4th 195, 235 [under section 352 "a trial court has broad discretion to exclude evidence it deems irrelevant, cumulative, or unduly prejudicial or time-consuming"].)

"'[T]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is 'prejudicial.' The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues."'" (*People v. Jones* (2017) 3 Cal.5th 583, 610; accord, *People v. Bell, supra*, 7 Cal.5th at p. 105 [""Evidence is not prejudicial, as that term is used in [the Evidence Code] section 352 context, merely because it undermines the opponent's position or shores up that of the proponent."'"].) "'[T]he trial court is vested with wide discretion in determining relevance and in weighing the prejudicial effect of proffered evidence against its probative value. Its rulings will not be overturned on appeal absent an abuse of that discretion.'" (*People v. Hardy, supra*, 5 Cal.5th at p. 87; accord, *Bell*, at p. 105.)

3.      *The trial court did not abuse its discretion*

Govan contends the trial court abused its discretion in admitting Kenyetta's testimony that she was forced into prostitution because the evidence was not probative of whether Govan coerced her to engage in oral copulation and sexual intercourse, and further, any relevance was outweighed by the

31

prejudice from the sympathy the jury would feel for Kenyetta based on the testimony. The trial court did not abuse its discretion.

Evidence that Kenyetta was forced into prostitution was relevant to explain why Kenyetta did not report in her 911 call that she was raped and forced to orally copulate Govan at gunpoint, instead stating only that she was ordered at gunpoint to orally copulate Govan but refused. Because Kenyetta's credibility was at issue, evidence that she was forced into prostitution and fearful of her pimp was relevant to explain why she was not forthcoming in the 911 call. (Evid. Code, § 780 ["Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing. . . ."]; *People v. Sandoval* (2015) 62 Cal.4th 394, 430 ["'evidence of a "third party" threat may bear on the credibility of the witness, whether or not the threat is directly linked to the defendant'"]; *People v. Mendoza* (2011) 52 Cal.4th 1056, 1085 ["[A] trial court has discretion, within the limits of Evidence Code section 352, to permit the prosecution to introduce evidence supporting a witness's credibility on direct examination, particularly when the prosecution reasonably anticipates a defense attack on the credibility of that witness."].)[10]

---

[10] We recognize the prosecution could have buttressed Kenyetta's credibility by eliciting that she was fearful of her pimp without adding that she was forced into prostitution, but it was not an abuse of discretion for the trial court to allow into evidence both that she was forced into prostitution and that she was fearful of the pimp.

Govan's argument under Evidence Code section 352 likewise fails. Govan's attorney did not object on this basis (asserting only relevance and speculation), thereby forfeiting this contention on appeal. (*People v. Valdez* (2012) 55 Cal.4th 82, 138 [objections based on relevance or foundation "were insufficient to preserve for appeal the claim that the trial court should have excluded the evidence under Evidence Code section 352"]; *People v. Barnett* (1998) 17 Cal.4th 1044, 1130 [relevancy objection did not preserve for review claim under Evidence Code section 352].) Even if Govan had not forfeited this contention, it would not have been an abuse of discretion for the trial court to find the probative value of Kenyetta's testimony that she was forced into prostitution was not substantially outweighed by the potential prejudice from the jury having sympathy for Kenyetta.

D. *The Trial Court Did Not Err in Finding Soraya Was Unavailable as a Witness*

1. *Trial court proceedings*

On October 20, 2021, during trial, the trial court conducted a hearing on the prosecution's efforts to subpoena Soraya and compel her to appear and testify at trial. The prosecutor requested the court find Soraya was unavailable and to allow her preliminary hearing testimony to be read to the jury.

Detective Stonich testified she first met Soraya three days after Soraya's encounter with Govan. At that time, Soraya was willing to cooperate in the prosecution of the case. Soraya testified at the preliminary hearing on July 18, 2019, which was the last time Detective Stonich saw her in person. After the preliminary hearing, Detective Stonich remained in telephonic contact with Soraya for more than two years, exchanging

33

between 15 and 20 text messages and phone calls with her. During that time, Soraya acknowledged receiving trial subpoenas from the district attorney's office. Soraya never indicated she did not want to testify at trial. Detective Stonich last spoke with Soraya in July 2021.

The parties stipulated that the district attorney's office mailed a subpoena to Soraya's last known address on October 4, 2021. Detective Stonich followed up with five phone calls and two text messages to Soraya during the period from October 13 through October 17, but Soraya did not respond. On cross-examination, Detective Stonich acknowledged she did not use any databases available through the Los Angeles County Sheriff's Department to locate Soraya, nor did she contact Soraya's family.

On Monday morning, October 18, 2021, the prosecutor asked Jose Medrano, a senior investigator for the Los Angeles County District Attorney's Office, to locate Soraya. Medrano obtained the address where Soraya had previously been served and the telephone number the office had used to contact her. Medrano called the telephone number, but the call went to voicemail. Medrano then went to Soraya's home address and spoke with Soraya's cousin about Soraya's whereabouts. While Medrano was at the home, the cousin called Soraya using a different phone number than the one Medrano had used to contact her. Medrano spoke with Soraya by video chat. He was able to recognize her from a photograph he had been provided. Soraya stated she was in Portland and "couldn't freely speak at the moment." Medrano told Soraya he would leave his business card with her cousin and would call her after he left the location.

Medrano called Soraya from his vehicle using the number the cousin provided to him. Medrano learned Soraya was

engaged in commercial sex work in Portland, but she did not know her exact location. Medrano explained to Soraya that if she would tell him her location, he could arrange for bus or airplane transportation for her to travel back to Los Angeles. Soraya responded she did not have her identification with her and indicated "she wasn't easily accessible." However, she stated she would try to travel to Los Angeles by Friday.

Later on October 18 a witness coordinator from the district attorney's office spoke with Soraya on a speakerphone in Medrano's presence. The witness coordinator offered to arrange transportation for Soraya if she disclosed her location. Soraya did not provide her location in Portland to the witness coordinator.

On October 19, 2021 (the day before Medrano's testimony), Medrano again spoke with Soraya on the phone. Soraya confirmed she was "'working the street.'" Medrano heard a female voice in the background, and Soraya said she could not talk with him. Medrano continued the conversation by asking her "yes" and "no" questions. Soraya then reported she was trying to get gas money from an aunt to return to Los Angeles. Shortly after the phone call with Soraya, Medrano received a text message from a person who claimed to be Soraya's cousin, "stating that Soraya was in trouble" and a man in Portland was not allowing her to speak or move freely. Medrano called Soraya's cousin and "instructed her that if she could get ahold of Soraya and let [Medrano] know where [Soraya] was, [he] could try to contact somebody [to assist]. If not, that if she could get ahold of Soraya, or a family member to find out where she was, to contact the local police in whatever jurisdiction she was." Later, Soraya sent a text message to Medrano that she would try to

35

leave at 4:00 a.m. the next morning to travel to Los Angeles. Medrano sent Soraya a text message shortly before 9:00 a.m. on October 20, but he did not receive a response.

Medrano admitted on cross-examination that he did not contact law enforcement in Portland to try to locate Soraya and serve her with a subpoena, explaining he "didn't know where she was, [or] if she even was in Portland." Further, no one from either the district attorney's office or the sheriff's department went to Portland to try to find Soraya.

After hearing argument from counsel, the trial court ruled the prosecution had exercised reasonable diligence but was unable to procure Soraya's trial attendance, and thus Soraya was unavailable as a witness under Evidence Code section 240, subdivision (a)(5). The court explained, "In 2018 it sounds like [Soraya] cooperated with the investigation; she showed up at [the preliminary hearing]. . . . And during the time between 2018, I guess, up to July 2021, Detective Stonich has had contact with this witness between 15 and 20 times, either personally, telephonically, or through text messages. And there was no indication from the witness that she was unwilling or uncooperative with respect to the court process and coming to court. . . . And it didn't sound like the prosecution was aware of her moving out of state or going out of state to Portland. It sounds like from the moment they were unable to contact the witness—and this start[ed on] Wednesday, October 13—Detective Stonich made five phone calls to [Soraya], [and] didn't receive any telephone calls."

The court continued, "[Medrano] was notified on Monday. He actually spoke with someone who knew where she was, and it sounds like there [were] reasonable diligent efforts to get ahold of

36

her: spoke to a cousin, spoke to a neighbor, found out she's in Portland, [and] was able to video chat with her.  And Soraya tells him that . . . she's working as a commercial sex worker in Portland.  She's not able to talk.  There is no way of extracting any other information from the witness.  She says she's in Portland.  We think she's in Portland but . . . she's not giving up that information.  So while she's cooperating insofar as wanting to come to court and testifying, . . . it sounds like she is uncooperative insofar as revealing where she is in Portland; if she is in Portland, an address where law enforcement can go and serve her with a subpoena, [or] where arrangements can be made where she can be picked up . . . and driven down to California in Los Angeles to testify."

The court added, "Sending people out to Portland wouldn't help, because they don't even know if she, in fact, is in Portland, or where in Portland to look.  And there's no database information that would provide a location or an address.  So based upon the evidence the court has heard, I am going to find that Soraya is unavailable pursuant to Evidence Code section 240, and . . . based upon that finding the People are going to be desirous of reading her testimony into the record."  Subsequently, Soraya's preliminary hearing testimony was read to the jury.

### 2.    *Governing law and standard of review*

Defendants have a state and federal constitutional right to confront witnesses against them.  (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.)  "Although the constitutional right of confrontation is important, it is not absolute.  [Citation.]  If a witness is unavailable but had previously testified against the

37

defendant and was subject to cross-examination at that time, that prior testimony may be admitted." (*People v. Wilson* (2021) 11 Cal.5th 259, 290 (*Wilson*); accord, *People v. Ng* (2022) 13 Cal.5th 448, 539; see Evid. Code, § 1291, subd. (a)(2) ["Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] . . . [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."].)

"In a criminal case, the prosecution bears the burden of showing that the witness is unavailable and, additionally, that it made a 'good-faith effort' . . . or, equivalently, exercised reasonable or due diligence to obtain the witness's presence at trial." (*People v. Sánchez* (2016) 63 Cal.4th 411, 440 (*Sánchez)*; accord, *Wilson, supra*, 11 Cal.5th at p. 291; see Evid. Code, § 240, subd. (a)(5) [declarant is "unavailable as a witness" if "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process"].)

Due diligence """connotes persevering application, untiring efforts in good earnest, [and] efforts of a substantial character.""" (*Wilson, supra*, 11 Cal.5th at p. 291; accord, *Sánchez, supra*, 63 Cal.4th at p. 440.) "We evaluate whether the prosecution timely searched for the unavailable witness, whether the prosecution 'competently explored' leads on the witness's location, and the overall import of the unavailable witness's testimony." (*Wilson*, at p. 291; accord, *Sánchez*, at p. 440.) "We review de novo the trial court's unavailability determination,

although we defer to the trial court's determination of historical facts supported by substantial evidence." (*Wilson*, at p. 291; accord, *Sánchez*, at p. 440.)

> 3.    *The prosecution exercised reasonable diligence in its efforts to secure Soraya's attendance at trial*

Govan contends the prosecution failed to meet its burden to show due diligence in its efforts to locate Soraya and ensure her attendance at trial, especially in light of the importance of her testimony and the risk she would become unavailable given her position as a sex worker. The trial court did not err in finding reasonable diligence.[11]

Because of the COVID-19 pandemic, the trial was continued multiple times, finally being set on October 14, 2021. As discussed, from when Detective Stonich first met Soraya in early December 2018 until July 2021, Soraya was cooperative. Soraya testified at the preliminary hearing in July 2019, and for the following two years, Detective Stonich and Soraya

---

[11]    The People contend Govan forfeited his claim that the admission of Soraya's preliminary hearing testimony violated his right to confront Soraya under the confrontation clauses of the state and federal constitutions because Govan did not raise this issue in the trial court. Govan did not forfeit this contention. Following the trial court's ruling that Soraya was an unavailable witness and the prosecution could read her preliminary hearing testimony into the record, Govan's attorney stated, "I wanted to ask the court to reconsider allowing the transcript to come in, because my client's right to cross-examination was severely curtailed." The court overruled Govan's objection to Soraya's testimony based on the confrontation clause of the Sixth Amendment.

communicated 15 to 20 times by text messages or phone calls. Soraya acknowledged she had received trial subpoenas from the district attorney's office, and she never stated she did not want to testify at trial.  As the trial date approached, the district attorney's office mailed a subpoena to Soraya's address (where she had been previously served) on October 4, 2021.  From October 13 to 17, Detective Stonich attempted to contact Soraya by phone calls or text messages on multiple occasions, but without success.

On October 18 Medrano was assigned to find Soraya, but she did not respond to his telephone call at the number the office had previously used.  He went to Soraya's home address, where he was able to speak first with the cousin, then with Soraya by video chat.  Medrano learned for the first time that Soraya was (she said) in Portland, but she would not provide her address to Medrano or the witness coordinator.  Soraya continued to state she was trying to get to Los Angeles, although she rejected the offers from the district attorney's office of assistance.  On October 19 Soraya texted Medrano to say she was hoping to leave the next day at 4 a.m. to come to Los Angeles, but she did not respond to Medrano's follow-up text message on October 20.  It was on that day that the prosecutor requested the court deem Soraya an unavailable witness.

Govan posits Detective Stonich or Medrano should have used the sheriff's department's databases to try to locate Soraya, sent someone to Portland to retrieve her, contacted law enforcement in Portland, searched Soraya's cell phone activity, or reviewed her posts on Backpage or other websites to locate her. But it is speculative whether Soraya could have been located through these means given her occupation and Soraya's

40

reluctance to provide contact information to Medrano, with no confirmation she even was in Portland.  Moreover, although perhaps a full-scale investigation could have uncovered additional information on Soraya's whereabouts, the record reflects the prosecution "timely searched" for Soraya and "'competently explored' leads" on Soraya's location.  (*Wilson, supra*, 11 Cal.5th at pp. 291-292 [prosecution exercised reasonable diligence where detective visited witness's last known address and workplace multiple times, visited another location the witness had frequented, spoke with the witness's ex-girlfriend, and confirmed the witness was not in custody]; accord, *Sánchez, supra*, 63 Cal.4th at pp. 442-443 [prosecution exercised due diligence in attempting to locate witness through contact with his brother where the witness had "returned to his native Mexico, and was apparently living in a village with only one communal telephone," and the brother had made several unsuccessful attempts to contact him; as to 16-year-old witness, reasonable efforts were made to locate her where she had been cooperative until she had a baby and was released from custody in another matter].)

Moreover, even assuming Soraya was in Portland, it is unlikely an additional investigation would have located her in time for her to testify at trial.  Jury selection started on October 14, and the first witness (Markita) testified on October 18.  Further, the prosecution did not learn that Soraya had moved until October 18, and it was not apparent until October 20 that she was unwilling or unable to come to Los Angeles.  Under these circumstances, the prosecution's efforts to locate Soraya and bring her to Los Angeles to testify at trial were sufficient to support a finding of reasonable diligence.  (*Sánchez,*

41

*supra*, 63 Cal.4th at p. 442 [rejecting contention prosecution should have sent an investigator to Mexico to try to find witness and convince him to voluntarily return to testify, explaining "[t]he prosecution must do what is reasonable under the circumstances, not necessarily everything that can be suggested in hindsight"]; *People v. Valencia* (2008) 43 Cal.4th 268, 292-293 [""[t]hat additional efforts might have been made or other lines of inquiry pursued does not affect [the] conclusion" that prosecution exercised due diligence, where the investigator attempted to obtain witness's new phone number through the phone company, obtained two addresses through the Department of Motor Vehicles, visited these two addresses and spoke with neighbors, and checked databases for the witness's criminal history, credit information, and real estate holdings]; see *Wilson, supra*, 11 Cal.5th at p. 292 [rejecting argument there was no reasonable diligence on the basis "the prosecution could have checked with [the witness's] relatives, assigned multiple investigators to the task of locating [the witness], or sought records from the Department of Motor Vehicles"].)

 *People v. Louis* (1986) 42 Cal.3d 969 (*Louis*), relied on by Govan, is distinguishable.  There, the witness, who was in custody on one theft-related felony and awaiting sentencing on another, refused to testify at the trial of Louis's codefendants unless he was "released on his own recognizance to spend the weekend between the end of his testimony and his scheduled sentencing hearing with an unnamed friend at an undisclosed address." (*Id*. at p. 990.)  The prosecutor agreed, and the witness was released after he testified in the codefendants' trial.  The witness was told to appear for his sentencing, but he

42

disappeared, and the prosecution was unable to locate him prior to Louis's trial.  (*Ibid.*)

In reversing the trial court's finding of due diligence, the Supreme Court reasoned, "On the facts of this case, the diligence required of the prosecution to prevent [the witness] from becoming absent was particularly high.  Defendant was to go on trial for his life; [the witness] was a critical prosecution witness, and was known to be both unreliable and of suspect credibility— the very type of witness that requires, but is likely not to appear to submit to, cross-examination before a jury." (*Louis, supra*, 42 Cal.3d at p. 991.)  The *Louis* court added, "[T]he prosecution— at the very minimum—could have attempted to obtain from [the witness] and independently verify the name and address of the friend with whom he allegedly intended to spend the weekend. Further, it could then have [been] arranged that he be kept under surveillance during that period of time.  Whether merely obtaining the name and address of the friend would have prevented [the witness'] disappearance seems unlikely.  But the failure to take such minimal action plainly conflicts with the claim that the prosecution exercised due diligence." (*Id.* at p. 992.)

Similar to *Louis*, Soraya's testimony was critical to the charges against Govan for his false imprisonment, forcible oral copulation, and forcible rape of her.  But unlike the witness in *Louis* who was released from custody and posed a flight risk prior to sentencing, Soraya had cooperated with the prosecution (and Detective Stonich) during the two-year period from the preliminary hearing until just a few months before trial.  Given Soraya's cooperation, there was no justification to keep Soraya under surveillance, as suggested by Govan.  (See *Sánchez, supra*,

63 Cal.4th at p. 447 ["the prosecution was not required to try to keep [the witness] in custody until she testified" where she was cooperative and the prosecution "did not believe it would be difficult to obtain her trial testimony"].)

E.     *The Jury Instruction on the Witness Certainty Factor Did Not Constitute Prejudicial Error*

Govan contends with respect to the counts relating to Breauhna the trial court erred in instructing the jury with CALCRIM No. 315 on eyewitness identification that it may consider, among other factors, "[h]ow certain was the witness when he or she made an identification."[12] Govan argues the trial

_____

[12]     The court instructed the jury with a modified version of CALCRIM NO. 315, as follows: "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. In evaluating identification testimony, consider the following questions: Did the witness know or have contact with the defendant before the event? How well could the witness see the perpetrator? What were the circumstances affecting the witness'[s] ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation? How closely was the witness paying attention? Was the witness under stress when he or she made the observation? Did the witness give a description and how does that description compare to the defendant? How much time passed between the event and the time when the witness identified the defendant? Was the witness asked to pick the perpetrator out of a group? Did the witness ever fail to identify the defendant? Did the witness ever change his or her mind about the identification? How certain was the witness when he or she made an identification? Are the witness and the defendant of different races? Was the witness able to identify the defendant in a

44

court committed state law error and violated his due process rights by ignoring the Supreme Court's direction in *Lemcke, supra*, 11 Cal.5th at pages 647 to 648 that courts "should omit" the certainty factor when instructing with CALCRIM No. 315.[13]

In *Lemcke*, the Supreme Court observed that "[c]ontrary to widespread lay belief, there is now near unanimity in the empirical research that 'eyewitness confidence is generally an unreliable indicator of accuracy.'" (*Lemcke, supra*, 11 Cal.5th at p. 647.) The court explained, "As currently worded, CALCRIM No. 315 does nothing to disabuse jurors of that common

---

photographic or physical lineup? Were there any other circumstances affecting the witness'[s] ability to make an accurate identification?"

[13] The People argue Govan forfeited his claim of instructional error by failing to object to the trial court's instruction on witness certainty. But we review any claim of instructional error that affects a defendant's substantial rights even absent an objection. (§ 1259 ["The appellate court may also review any instruction given . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."]; *People v. Burton* (2018) 29 Cal.App.5th 917, 923 ["'Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights.'"]; *People v. Bedolla* (2018) 28 Cal.App.5th 535, 544 [same].) "And '[w]e can only determine if [a] defendant['s] substantial rights were affected by deciding whether the instruction was given in error and, if so, whether the error was prejudicial.'" (*People v. Delgado* (2022) 74 Cal.App.5th 1067, fn. 10.) That is, if Govan's claim has merit, it has not been forfeited. We therefore necessarily review the merits of Govan's contention the instruction violated his constitutional rights. Because we find no forfeiture, we do not reach Govan's argument his attorney's failure to object constituted ineffective assistance of counsel.

45

misconception, but rather tends to reinforce it by implying that an identification is more likely to be reliable when the witness has expressed certainty.  This is especially problematic because many studies have also shown eyewitness confidence is the single most influential factor in juror determinations regarding the accuracy of an identification." (*Ibid.*)  The court referred consideration of the instruction to the Judicial Council and its Advisory Committee on Criminal Jury Instructions "to evaluate whether or how the instruction might be modified to avoid juror confusion regarding the correlation between certainty and accuracy." (*Ibid.*)  The court also directed that until the Judicial Council completes its review, "trial courts should omit the certainty factor from CALCRIM No. 315 unless the defendant requests otherwise." (*Id.* at pp. 647-648.)

Notwithstanding the directive in *Lemcke* that trial courts should omit the certainty factor when instructing with CALCRIM No. 315, the Supreme Court rejected the defendant's due process challenge, holding, "When considered in the context of the trial record as a whole, listing the witness's level of certainty as one of 15 factors the jury should consider when evaluating identification testimony did not render [defendant's] trial fundamentally unfair." (*Lemke, supra*, 11 Cal.5th at p. 646.)  Following *Lemcke*, the Supreme Court in *People v. Wright* (2021) 12 Cal.5th 419, 453 (*Wright*) similarly concluded inclusion of the witness certainty factor in CALJIC No. 2.92[14] did not violate the defendant's due process rights.  (See *People v. E.H.* (2022) 75 Cal.App.5th 467, 471 [instruction with "CALCRIM No. 315's certainty factor does

---

[14]    As the Supreme Court observed in *Lemcke, supra*, 11 Cal.5th at page 656, footnote 6, there is no material difference between CALCRIM No. 315 and CALJIC No. 2.92.

46

not violate due process"]; *People v. Delgado* (2022) 74 Cal.App.5th 1067, 1085 [instruction on witness certainty factor did not violate defendant's due process rights]; *People v. Greeley* (2021) 70 Cal.App.5th 609, 622 [defendant "failed to establish that the inclusion of the certainty factor in CALCRIM No. 315 violated her due process rights"].)

Govan acknowledges the Supreme Court's holdings in *Lemcke* and *Wright* that the jury instruction on the witness certainty factor did not violate those defendants' due process rights. But he notes the *Lemcke* court highlighted as to CALCRIM No. 315 that although "the wording of the instruction might cause some jurors to infer that certainty is generally correlative of accuracy," the defendant was "permitted to present expert witness testimony to combat that inference." (*Lemcke, supra*, 11 Cal.5th at p. 657-658.) By contrast, Govan asserts, there was no expert testimony in this case to place the certainty factor "in proper context." However, whether there is an eyewitness expert is only one factor to consider. In *Wright*, for example, the court found no due process violation even though the defense did not call an eyewitness identification expert, instead employing a trial strategy to discredit the witnesses. (*Wright, supra*, 12 Cal.5th at p. 453.) It was Govan's decision not to call a witness identification expert at trial, and as in *Wright*, he challenged Breauhna's credibility through cross-examination eliciting that Breauhna sent the text messages to Govan from a different phone number than her own and used a pseudonym to conceal her real name. And Govan testified he never met Breauhna, impliedly questioning whether she was telling the truth that he was the perpetrator.

47

Moreover, although Breauhna identified Govan as the perpetrator in court by identifying where he was seated and what he was wearing, she did not testify she was certain of her identification. Govan claims the prosecutor improperly emphasized the certainty of Breauhna's identification by stating in her closing argument that Breauhna saw Govan's face. The prosecutor argued, "[Breauhna] communicates with [Govan] via text for several days. They exchanged numbers, face-time calls. She sees his face. She agrees to allow him to come to her home to bring lunch because he seemed like a nice guy." The argument was proper. As CALCRIM No. 315 provides, the jury may consider whether the witness had "contact with the defendant before the event" and "[h]ow well could the witness see the perpetrator." The prosecutor's argument was consistent with Breauhna's testimony that she had a video chat with Govan on the morning before they met for a lunch date at her apartment.

Moreover, the trial court's instruction on witness certainty did not violate due process "when considered "'in the context of the instructions as a whole and the trial record.'"" (*Lemcke, supra*, 11 Cal.5th at p. 661; accord, *Wright, supra*, 12 Cal.5th at p. 453.) As Govan acknowledges, the trial court instructed the jury that Govan was presumed innocent; the People must prove Govan guilty beyond a reasonable doubt; the People must prove Govan "did the acts charged" and "acted with a particular intent or mental state"; the jury "alone must judge the credibility or believability of the witnesses"; and the factors in evaluating a witness's testimony included that "people sometimes honestly forget things or make mistakes about what they remember." These jury instructions are similar to those the Supreme Court considered in *Lemcke* and *Wright* in concluding the instruction on

48

the witness certainty factor did not amount to a due process violation when considered in the context of the jury instructions as a whole. (See *Wright, supra*, 12 Cal.5th at p. 453 [jury was instructed "concerning the believability of a witness" and "a witness who is willfully false"]; *Lemcke, supra*, 11 Cal.5th at p. 658 [jury instructed on the presumption of innocence and the prosecution's burden of proof, that jurors were responsible for judging witness credibility, and that witnesses "'sometimes honestly . . . make mistakes about what they remember'"].)

Moreover, even if it were state law error for the court to instruct on the witness certainty factor following *Lemcke*, any error was harmless because Breauhna did not testify that she was certain that Govan was the perpetrator.[15] (See *People v. Beltran* (2013) 56 Cal.4th 935, 955 [harmless error standard under *People v. Watson* (1956) 46 Cal.2d 818, 836 applies to instructional error that does not amount to federal constitutional error]; *People v. Larsen* (2012) 205 Cal.App.4th 810, 830 [same].)

F.  *Remand for Resentencing Under Amended Section 1170, Subdivision (b), Is Warranted*

1.  *The sentencing*

As discussed, the trial court sentenced Govan to the upper term of four years on count 13 for the attempted rape of Markita. (See §§ 264 [specifying punishment for rape] & 664, subd. (a).) The court explained it imposed the upper term pursuant to California Rules of Court, rule 4.421(a)(1) because the crime "involved great violence, great bodily injury, threat of great

---

[15]  *Lemcke* was decided in May 2021, approximately five months before the trial court instructed the jury (on October 21, 2021).

49

bodily injury, or other acts disclosing a high degree of cruelty, viciousness, or callousness." The court continued, "I'm also relying on [rule] 4.421(a)(2); the defendant was armed with a weapon. . . . [I]t's unclear whether or not this was a real gun, but more likely than not it was an Airsoft weapon. We know Markita recovered an Airsoft magazine from the incident with the defendant. Even though an Airsoft gun is not a real gun, I do believe it qualities as a weapon, and at a minimum he used that weapon to threaten and menace the victim. And then lastly, the court's relying on rule 4.421, subdivision (a)(8), the manner in which the crime was carried out contained planning, sophistication, or premeditation. And in this case, in light of all the other crimes he committed and the way in which he contacted Soraya G., Kenyetta F., and Markita L., he contacted them either online or via text. He met them at the apartment complex. He took them to a laundry room. And the acts that were involved were very similar . . . [H]e had them forcibly orally copulate him, and then he forcibly raped them. And so for all those reasons the court is selecting the high-term as to count 13 of 4 years."

The court also imposed and stayed under section 654 three-year terms (the upper terms) on each false imprisonment by violence count (counts 1, 7, 10). However, the court did not state any aggravating circumstance for imposition of the upper terms.

2.  *Governing law*

At the time the trial court sentenced Govan in 2021, former section 1170, subdivision (b), stated, "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court." (Stats. 2020, ch. 29,

§ 14.)  Effective January 1, 2022, Senate Bill 567 (2019–2020 Reg. Sess.) amended section 1170, subdivision (b), to provide, "(1) When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2).  [¶] (2)  The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial.  [¶]  (3)  Notwithstanding paragraphs (1) and (2), the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury."  (Stats. 2021, ch. 731, § 1.)

Govan contends, the People concede, and we agree Senate Bill 567's changes to amended section 1170, subdivision (b), are ameliorative changes that apply retroactively to Govan's nonfinal judgment under *In re Estrada, supra*, 63 Cal.2d at pages 744 to 745.  (See *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 308 ["'in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not'"]; *People v. Dunn* (2022) 81 Cal.App.5th 394, 403 ["As Senate Bill 567's amendments to section 1170, subdivision (b), lessen punishment, and there is no indication that the Legislature intended it to apply prospectively only, the new law must be

retroactively applied."], review granted Oct. 12, 2022, S275655; *People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1108 (*Zabelle*); *People v. Lopez* (2022) 78 Cal.App.5th 459, 465 (*Lopez*).)

>   3.    *Remand for resentencing is appropriate because the error in imposing the upper terms was not harmless*

Govan contends the trial court's imposition of the upper term of four years for attempted rape and three years for each of the three false imprisonment counts violated the Sixth Amendment and failed to comply with amended section 1170, subdivision (b). Govan's contention has merit.

Contrary to the People's assertion, the trial court did not rely on Govan's prior sustained petition for rape in concert when imposing the upper terms for the false imprisonment and attempted rape counts. The only discussion of Govan's prior sustained petition (cited by the People) is in the context of Govan's *Romero* motion, which the court granted. Further, the court relied on three aggravating circumstances in imposing the upper term for attempted rape, but with respect to the three false imprisonment counts, it did not specify any aggravating circumstance when imposing the upper terms. And Govan did not stipulate to, and the jury did not find beyond a reasonable doubt the facts underlying any aggravating circumstances for the attempted rape or false imprisonment counts. (See *Cunningham v. California* (2007) 549 U.S. 270, 281 ["under the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence"]; *People v. Ross* (2022) 86 Cal.App.5th 1346, 1353 (*Ross*) [imposition of upper term based

52

on trial court's findings on aggravating factors was erroneous under section 1170, subdivision (b), because "defendant had not stipulated to the facts underlying these factors, nor were the facts found true beyond a reasonable doubt by a jury"], review granted Mar. 15, 2023, S278266; *Zabelle, supra*, 80 Cal.App.5th at pp. 1109-1111 ["the trial court's imposition of the upper term based on its own factfinding violated defendant's rights under the Sixth Amendment" and section 1170, subdivision (b)].)

The Supreme Court has granted review in *People v. Lynch* (May 27, 2022, C094174) [nonpub. opn.], review granted August 10, 2022, S274942, to decide what prejudice standard to apply when determining whether a case should be remanded for resentencing under amended section 1170, subdivision (b). Until the Supreme Court resolves the issue, we apply the two-step harmless error test set forth in *Zabelle, supra*, 80 Cal.App.5th at pages 1111 to 1112 and the related approach in *Lopez, supra*, 78 Cal.App.5th at pages 465 to 467. First, we evaluate whether the Sixth Amendment error is harmless under the *Chapman* standard as formulated by *People v. Sandoval* (2007) 41 Cal.4th 825, 839: "'[I]f a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury, the Sixth Amendment error properly may be found harmless.'" (*Zabelle*, at p. 1111.) Second, we apply the *Watson* harmless-error standard to evaluate state law error by considering "whether it is reasonably probable that the trial court would have chosen a lesser sentence in the absence of the error." (*Zabelle*, at p. 1112.) As the *Zabelle* court explained, "Resolving this issue entails two layers of review. We must first, for each

53

aggravating fact, consider whether it is reasonably probable that the jury would have found the fact not true. We must then, with the aggravating facts that survive this review, consider whether it is reasonably probable that the trial court would have chosen a lesser sentence had it considered only these aggravating facts." (*Ibid.*)

Applying the two-step harmless error analysis to the false imprisonment counts, we conclude remand for resentencing under section 1170, subdivision (b), is necessary. Because the trial court did not specify which aggravating factors it relied on when imposing the upper term (and there is no indication the court relied on Govan's prior sustained petition), the Sixth Amendment error was not harmless under the *Chapman* standard. We cannot conclude beyond a reasonable doubt that the jury would have found beyond a reasonable doubt at least one aggravating circumstance had the circumstance been submitted to the jury. (*Zabelle, supra*, 80 Cal.App.5th at pp. 1111-1112.) Likewise, the state law error was not harmless under the *Watson* standard because we cannot conclude that the trial court "*would* have imposed the upper term even absent the error." (*Zabelle*, at p. 1112.)

Therefore, as to the false imprisonment counts, the constitutional and statutory violations were not harmless under *Chapman* and *Watson*. (See *People v. Lewis* (2023) 88 Cal.App.5th 1125, 1139 [sentence invalid under amended section 1170, subdivision (b), where reviewing court was "uncertain that a jury would have found any of the aggravated circumstances the trial court relied on true beyond a reasonable doubt"], review granted May 17, 2023, S279147; see *Ross, supra*, 86 Cal.App.5th at p. 1356 [remanding for resentencing based on

54

*Chapman* and *Watson* errors], review granted; *Lopez, supra*, 78 Cal.App.5th at p. 466 [finding *Chapman* error and remanding for resentencing, explaining "[i]t would be entirely speculative for us to presume, based on a record that does not directly address the aggravating factors, what a jury would have found true in connection with these factors"].)

Accordingly, we vacate the sentence and remand for the trial court to resentence Govan under amended section 1170, subdivision (b).[16] On remand, Govan is entitled to a full resentencing, including all applicable retroactive changes in the law. (See *People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425 ["the full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"]; *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances'"]; *People v. Jones* (2022) 79 Cal.App.5th 37, 46 ["the need to apply amended sections 1170, subdivision (b) and

---

[16] Because we remand for resentencing on the false imprisonment counts under amended section 1170, subdivision (b), we do not reach whether the trial court's imposition of the upper term for the attempted rape of Markita was harmless error. We observe, however, that on remand the People may elect to proceed under the amended requirements of section 1170, subdivision (b), which would allow the People to prove the existence of aggravating factors beyond a reasonable doubt to a jury or otherwise comply with section 1170, subdivision (b). In addition, on resentencing the trial court may in its discretion rely on the sustained juvenile petition for rape in concert pursuant to section 1170, subdivision (b)(3).

654 creates sufficiently "'"changed circumstances"'" [citation] to warrant a full resentencing"]; *People v. Garcia* (2022) 76 Cal.App.5th 887, 902 ["the trial court may revisit all of its sentencing choices in light of" the amendments to section 1170, subdivision (b)].)

G.    *Remand for Resentencing Under Amended Section 654 Is Appropriate*

At the time of Govan's sentencing in 2021, former section 654, subdivision (a), provided, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  As discussed, pursuant to former section 654, the trial court sentenced Govan to five 15 years-to-life terms under the one strike law (for forcible oral copulation and rape) on counts 2, 3, 8, 9, and 12 (in addition to the 15 years-to-life term for the forcible rape of Breauhna charged in count 16), and it imposed and stayed three-year terms on counts 1, 7, and 10 for false imprisonment relating to Soraya, Kenyetta, and Markita.

Effective January 1, 2022, Assembly Bill 518 (2021-2022 Reg. Sess.) amended section 654 "to remove the requirement that a court impose the longest sentence when a defendant is convicted of more than one offense arising from the same conduct."  (*Lopez, supra*, 78 Cal.App.5th at p. 468; accord, *People v. Mani* (2022) 74 Cal.App.5th 343, 379 ["section 654 now provides the trial court with discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the

longer sentence"].) Section 654, subdivision (a), now provides, "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."

Govan contends, the People concede, and we agree Assembly Bill 518's changes to section 654 are ameliorative changes that apply retroactively to nonfinal judgments under *In re Estrada, supra*, 63 Cal.2d at page 744 to 745. (See *People v. Fugit* (2023) 88 Cal.App.5th 981, 995-996 [defendant entitled to retroactive benefit of Assembly Bill 518]; *People v. Mani, supra*, 74 Cal.App.5th at pp. 379-380 [same]; see also *People v. Superior Court* (*Lara*)*, supra*, 4 Cal.5th at p. 308.) However, the People contend Govan is not entitled to resentencing on the counts relating to Soraya, Kenyetta, and Markita notwithstanding the changes to section 654 because section 667.61, subdivision (h), precludes the court from staying execution of a one-strike sentence, relying on *Caparaz, supra*, 80 Cal.App.5th at pages 689 to 690. We are not persuaded.

Section 667.61, subdivision (h), provides, "Notwithstanding any other law, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, a person who is subject to punishment under this section." Division Two of the First Appellate District concluded in *Caparaz, supra*, 80 Cal.App.5th at page 689 that this statutory provision bars a trial court from staying execution of a sentence under the one strike law, reasoning "[a] stay is a type of suspension." The court rejected the defendant's argument that section 667.61, subdivision (h), only prohibited the granting of probation for a one-strike offense. The court explained, "[T]his interpretation of

57

section 667.61(h) renders the phrase 'nor shall the execution or imposition of sentence be suspended for' meaningless, and 'interpretations that render statutory terms meaningless as surplusage are to be avoided.'" (*Caparaz*, at p. 689.) The court added, "The failure to identify section 654 is not dispositive; it is enough that the provision applies '[n]otwithstanding any other law.'" (*Ibid.*)

When interpreting a statute, "our core task . . . is to determine and give effect to the Legislature's underlying purpose in enacting the statutes at issue." (*McHugh v. Protective Life Ins. Co.* (2021) 12 Cal.5th 213, 227; accord *Jarman v. HCR ManorCare, Inc.* (2020) 10 Cal.5th 375, 381.) "We first consider the words of the statutes, as statutory language is generally the most reliable indicator of legislation's intended purpose. [Citation.] We consider the ordinary meaning of the relevant terms, related provisions, terms used in other parts of the statute, and the structure of the statutory scheme." (*McHugh*, at p. 227; accord, *Jarman*, at p. 381 ["'We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment.'"].) "If the relevant statutory language is ambiguous, we look to appropriate extrinsic sources, including the legislative history, for further insights." (*McHugh*, at p. 227; accord, *Skidgel v. California Unemployment Ins. Appeals Bd.* (2021) 12 Cal.5th 1, 14 [where the statutory language supports more than one reasonable construction, the court "may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history"].)

We disagree with our colleagues in *Caparaz* that the language "nor shall the execution or imposition of sentence be

suspended," as used in section 667.61, subdivision (h), precludes a trial court from exercising its discretion under amended section 654 to stay a sentence imposed under the one strike law. In interpreting the suspension of a sentence to include a stay, the *Caparaz* court relied on the language in *People v. Santana* (1986) 182 Cal.App.3d 185, 190 defining a "stay" of a sentencing enhancement as "a temporary suspension of a procedure in a case until the happening of a defined contingency." (*Caparaz, supra*, 80 Cal.App.5th at p. 689.) And it is true that a stay under section 654 has the effect of suspending a sentence until a specific contingency, that is, until the sentence imposed on another count is served. (See *People v. Beamon* (1973) 8 Cal.3d 625, 640 [holding under section 654 that "'execution of sentence for Count 1 [must] be stayed pending the finality of this judgment and service of sentence as to Count 2, such stay is to become permanent when service of sentence as to Count 2 is completed"].) However, it does not follow that the Legislature's use of the precise language "nor shall execution or imposition of sentence be suspended" in section 667.61, subdivision (h), was intended to bar a stay of a sentence under section 654, which uses different language and serves a separate purpose.

As discussed, the *Caparaz* court based its conclusion in part on its view that limiting application of section 667.61, subdivision (h), to prohibit only probationary sentences for one-strike offenders would render superfluous the language specifying "nor shall the execution or imposition of sentence be suspended." (*Caparaz, supra*, 80 Cal.App.5th at p. 689.) It does not. To the contrary, this terminology is unique to a grant of probation. In *People v. Howard* (1997) 16 Cal.4th 1081, 1087, the Supreme Court explained "the important distinction, in probation

59

cases, between orders suspending imposition of sentence and orders suspending execution of previously imposed sentences." If a trial court suspends "*imposition* of sentence before placing defendant on probation, the court unquestionably would have had full sentencing discretion on revoking probation. When the trial court suspends imposition of sentence, no judgment is then pending against the probationer, who is subject only to the terms and conditions of the probation." (*Ibid.*) If a trial court sentences a defendant but suspends "*execution* of that sentence during the probationary period," then "'revocation of the suspension of execution of the judgment brings the former judgment into full force and effect.'" (*Ibid*; accord, *People v. Segura* (2008) 44 Cal.4th 921, 932 ["A trial court grants probation by suspending the imposition of a sentence or imposing a sentence and suspending its execution. [Citation.] During the period of probation, the court may revoke, modify, or change its order suspending imposition or execution of the sentence, as warranted by the defendant's conduct. (§§ 1203.2, 1203.3.)"].)

The legislative history of the one strike law likewise shows the intent of the Legislature in enacting section 667.61, subdivision (h), was to prohibit trial courts from placing one-strike offenders on probation, not to extend the section's reach to bar other forms of suspended sentences. The Legislature enacted the one strike law in 1994 by the passage of Senate Bill No. 26X (1993-1994 1st Ex. Sess.) (Stats. 1994, 1st Ex. Sess. 1993, ch. 14, § 1, p. 8570) (Senate Bill 26X), which added former section 667.61. (See *People v. Acosta* (2002) 29 Cal.4th 105, 120.) The one strike law "sets forth an alternative and harsher sentencing scheme for certain sex crimes" and applies where, as here, the current offense was committed under one or more

60

specified circumstances set forth in section 667.61.[17]  (*People v. Anderson* (2009) 47 Cal.4th 92, 107-108.)  As the Senate Committee on Judiciary's Bill Analysis explained with respect to Senate Bill 26X, "The purpose of this bill is to increase the punishment for forcible sex offenses."  (Sen. Com. on Judiciary, 3d reading Analysis of Sen. Bill No. 26X (1993–1994 Reg. Sess.) as amended August 26, 1994.)  This purpose stands in contrast to that of section 654, which prohibits punishment for two crimes arising from a single, indivisible course of conduct.  As the Supreme Court observed in *People v. Latimer* (1993) 5 Cal.4th 1203, 1211, "We have often said that the purpose of section 654 'is to ensure that a defendant's punishment will be commensurate with his culpability.'"  (Accord, *People v. Hicks* (2017) 17 Cal.App.5th 496, 513-514 ["The purpose of section 654 is to ensure that a defendant's punishment is commensurate with his culpability and that he is not punished more than once for what is essentially one criminal act."].)

In addition, as the Senate Committee on Judiciary's analysis of Senate Bill 26X made clear, one purpose of the bill was to add more sex offenses to the list of sex offenses ineligible for probation.  (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 26X (1993-1994 Reg. Sess.) as amended May 4, 1994, p. 7.)  The committee analysis explained, "Existing law *prohibits probation* for a person who is convicted of lewd conduct with a child or continuous sexual abuse of a child and with a previous conviction for rape, committing a forcible sex act in concert, [and other specified sex crimes].  This bill would add to that

---

[17]    Similar to current section 667.61, subdivision (c), the 1994 version included as covered sex offenses forcible rape and forcible oral copulation.  (§ 667.61, former subds. (c)(1) & (c)(6).)

list . . . convictions for spousal rape, inducing the commission of a sexual act through false representation creating fear, and all forms of sodomy or oral copulation, whether or not by force." (*Ibid.*, italics added.) By contrast, the bill analysis contains no discussion of whether sentences for sex offenders may be stayed under section 654 where there is an indivisible course of conduct.

Our interpretation of section 667.61, subdivision (h), is also consistent with the Legislature's 1994 amendment in Senate Bill 26X of section 1203.066, which, with limited exceptions, prohibits a grant of probation to individuals convicted of lewd or lascivious acts on a child (§ 288) and continuous sexual abuse of a child (§ 288.5). Senate Bill 26X, amended section 1203.066, subdivision (a), to provide, "Notwithstanding Section 1203[18] *or any other law*, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, nor shall a finding bringing the defendant within the provisions of this section be stricken pursuant to Section 1385 for" any person convicted of violations of section 288 or 288.5. (Stats. 1994,1st Ex. Sess. 1993, Ch. 14, § 3, p. 8573, italics added.) The legislative history clarified that the "any other law" language added by Senate Bill 26X, which modified the phrases "probation shall not be granted" *and* "nor shall the execution or imposition of sentence be suspended," was included to ensure probation would not be granted to specified sex offenders regardless of what other laws provided. The Senate Committee on Judiciary analysis of Senate Bill 26X explained as to the amendment, "This bill would specify that the prohibition on granting probation takes precedence over

---

[18] Section 1203, among other things, sets forth the circumstances under which a defendant may be placed on probation.

any other law or exception." (Sen. Com. On Judiciary, Analysis of Sen. Bill No. 26X (1993-1994 Reg. Sess.) as amended May 4, 1994, pp. 6-7.) As with section 667.61, nothing in the legislative history reflects an intent in amending section 1203.066, subdivision (a), to prohibit application of section 654 to sentences imposed under that section.

In 2006, the Legislature amended the one strike law to conform it with the language added by Senate Bill 26X in 1994 to section 1203.066, subdivision (a). Senate Bill No. 1128 (2005-2006 Reg. Sess.) amended section 667.61, subdivision (h), by adding the prefatory language found in the current section, "Notwithstanding any other provision of law."[19] (Stats. 2006, Ch. 337, § 33, p. 2641.) In light of this amendment of section 667.61, subdivision (h), to track the language of section 1203.066, subdivision (a), it is reasonable to read the 2006 amendment to section 667.61, subdivision (h), consistent with the 1994 legislative history of section 1203.066, subdivision (a). Thus, both sections now prohibit a trial court from granting probation to specified sex offenders—but not from staying the sentence under section 654—regardless of what any other law might provide.

We therefore conclude section 667.61, subdivision (h), does not divest the trial court of discretion under section 654 to stay a sentence imposed under the one strike law. Because the

---

[19] The 1994 version of section 667.61, former subdivision (h), provided, "Probation shall not be granted, nor shall the execution or imposition of sentence be suspended for, any person who is subject to punishment under this section for any offense specified in paragraphs (1) to (6), inclusive of subdivision (c)." (Stats. 1994, 1st Ex. Sess. 1993, ch. 14, § 1, p. 8570.)

ameliorative changes to section 654 enacted by Senate Bill 518 apply, on remand the trial court must exercise its discretion in resentencing Govan under amended section 654.[20]

H. *The Trial Court Must Correct Govan's Custody Credit*

Govan contends, the People concede, and we agree the trial court erred in awarding Govan 1,008 days of presentence custody credit instead of 1,020 days. (*People v. Fuentes* (2022) 78 Cal.App.5th 670, 681 ["A defendant is entitled to credit for all days in presentence custody including the day of arrest and the day of sentencing."]; *People v. Dearborne* (2019) 34 Cal.App.5th 250, 267; see § 2900.5, subd. (a) ["In all felony and misdemeanor convictions, either by plea or by verdict, when the defendant has been in custody, including, but not limited to, any time spent in a jail, . . . all days of custody of the defendant . . . shall be credited upon his or her term of imprisonment."].) On remand, the court must award Govan presentence custody credit to reflect the actual days of custody from his arrest on January 24, 2019 up to and including his sentencing on November 8, 2021. (*People v. Jinkins* (2020) 58 Cal.App.5th 707, 712 ["'Courts may correct computational and clerical errors at any time.'"]; *People v. Torres* (2020) 44 Cal.App.5th 1081, 1085 [same].)

Govan also argues he is entitled to two additional days of presentence conduct credit because 15 percent of 1,020 days is

---

[20] We recognize the trial court is unlikely to impose the false imprisonment sentences and impose and stay the one-strike sentences for either forcible oral copulation or forcible rape of Soraya, Kenyetta, and Markita, but the court has discretion to do so under amended section 654.

153 days, but the trial court only awarded him 151 days. On March 24, 2023 we invited the parties to submit letter briefs addressing whether under section 667.61 Govan is entitled to any conduct credit.[21] He is not. We agree with the People that Govan is not entitled to any conduct credit because he was sentenced on counts 2, 3, 8, 9, 12, and 16 under the one strike law (§ 667.61).

We find persuasive the reasoning in *People v. Adams* (2018) 28 Cal.App.5th 170, 182: "Section 667.61 was amended in 2006 . . . to eliminate the existing section 667.61, subdivision (j) and any reference to presentence conduct credits. (Stats. 2006, ch. 337, § 33, pp. 2639, 2641.) It is uncertain on its face whether the amendment was intended to eliminate presentence conduct credit for defendants sentenced under section 667.61, or to authorize full conduct credit under section 4019. We turn, therefore, to the legislative history. Committee reports evidence the Legislature's intent to eliminate conduct credit for defendants sentenced under section 667.61, the so-called 'One-Strike Law.' The Senate Committee on Public Safety's analysis of Senate Bill No. 1128 (2005-2006 Reg. Sess.) unambiguously states: 'Elimination of Sentencing Credits for One-Strike Inmates [¶]

---

[21] We must correct an unauthorized sentence even where the corrected sentence results in a longer term. (*People v. Serrato* (1973) 9 Cal.3d 753, 764 [an unauthorized sentence "is subject to being set aside judicially and is no bar to the imposition of a proper judgment thereafter, even though it is more severe than the original unauthorized pronouncement"], disapproved on another ground in *People v. Fosselman* (1983) 33 Cal.3d 572, 583, fn. 1; *People v. Vizcarra* (2015) 236 Cal.App.4th 422, 432, 438 [affirming seven-year increase in sentence on remand because initial sentence was unauthorized].)

Existing law provides that a defendant sentenced to a term of imprisonment of either 15 years to life or 25 years to life under the provisions of the "one-strike" sentencing scheme shall not have his or her sentence reduced by more than 15% by good-time/work-time credits. [Citation.] [¶] This bill eliminates conduct/work credits for inmates sentenced under the one-strike law.' (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 1128 (2005-2006 Reg. Sess.) as amended Mar. 7, 2006, p. N, underscoring omitted; accord, *id.* at p. W ['This bill eliminates sentencing credits that under existing law can reduce a defendant's minimum term by up to 15%' (underscoring omitted)]; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1128 (2005–2006 Reg. Sess.) as amended May 26, 2006, pp. 8-9 [Sen. Bill No. 1128 eliminates eligibility 'for credit to reduce the minimum term imposed']; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1128 (2005-2006 Reg. Sess.) as amended May 30, 2006, p. 9 [same].)'" (Accord, *People v. Dearborne, supra,* 34 Cal.App.5th at pp. 267-268.)[22]

---

[22] Govan argues in his supplemental letter brief that although two staff reports state the 2006 amendment to section 667.61 was intended to eliminate conduct credit for one-strike offenders, the legislative intent was ambiguous because other committee reports were silent on this issue. We disagree with Govan's assertion that silence in a committee report creates an ambiguity as to what the Legislature intended notwithstanding a clear expression of intent in other committee reports. To the contrary, we agree with the *Adams* court that the reports that discuss the deletion of former section 667.61, subdivision (j), make clear the purpose was to eliminate conduct credit so that defendants were not eligible for the 15 percent conduct credit they would

Accordingly, we agree with our colleagues in *Dearborne* and *Adams* that one-strike offenders sentenced to indeterminate terms under section 667.61 are not entitled to any presentence conduct credit.  (*People v. Dearborne, supra,* 34 Cal.App.5th at p. 268; *People v. Adams, supra*, 28 Cal.App.5th at p. 182.)

## DISPOSITION

The judgment of conviction is affirmed.  We vacate the sentence and direct the trial court to resentence Govan in accordance with sections 654 and 1170, subdivision (b), and any other applicable ameliorative legislation.  The court also must recalculate the presentence custody credit to include the actual time Govan spent in custody from his arrest up to and including his sentencing but not any conduct credit.

FEUER, J.

We concur:


PERLUSS, P. J.


SEGAL, J.

---

otherwise receive.  (*People v. Adams, supra*, 28 Cal.App.5th at p. 182.)